**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**JAMES DEAN MILLER,**

      **Plaintiff,**

**v.**                                     **Case No. 2:13-cv-31251**

**CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,**

      **Defendant.**

**MEMORANDUM OPINION**

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the Court on the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 13 & 16). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 3 & 5). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court **FINDS** that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

1

## I.    <u>Procedural History</u>

Plaintiff James Dean Miller ("Claimant") protectively filed for DIB and SSI on February 8, 2011. (Tr. at 134, 139). Claimant alleged a disability onset date of April 1, 2002, (*id.*), due to "bilateral eye problems, back problems, face injury, and learning problems." (Tr. at 189). The Social Security Administration ("SSA") denied the applications initially and upon reconsideration. (Tr. at 63, 68, 76, 79). Claimant filed a request for a hearing, (Tr. at 83), which was held on August 6, 2012 before the Honorable Jack Penca, Administrative Law Judge ("ALJ"). (Tr. at 30-58). At the administrative hearing, Claimant orally amended his alleged disability onset date to August 18, 2006. (Tr. at 34). By written decision dated August 14, 2012, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 13-25). The ALJ's decision became the final decision of the Commissioner on October 10, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

On December 5, 2013, Claimant filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer and a Transcript of the Proceedings on March 11, 2014. (ECF Nos. 10 & 11). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 13 & 16). Accordingly, this matter is ripe for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 45 years old at the time of his alleged onset of disability and 51 years old on the date of the ALJ's decision. (Tr. at 25, 34-35). He completed the eighth grade, but dropped out of school after doing so, and never obtained a GED. (Tr. at 36, 190, 341, 467). Claimant repeated the first, second, and eighth grades;

2

however, he was never enrolled in special education classes. (Tr. at 190, 341). He communicates in English, and he reports difficulty in reading and writing. (Tr. at 36, 51, 188, 341). Claimant has prior work experience as a laborer for a construction company, which involved electrical and supervisory work.[1] (Tr. at 43, 47, 181, 190, 195). He has also worked as a garbage truck greaser. (Tr. at 43).

### III.   Summary of ALJ's Findings

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.*

---

[1] At his consultative examinations, Claimant described his past work as that of an electrician or electrician's helper and stated that he worked in that field until either 1999 or 2003. (Tr. at 331, 341, 467).

3

§§ 404.1520(d), 416.920(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" when assessing disability. 20 C.F.R. §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment.

*Id.* §§ 404.1520a(b), 416.920a(b). If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the degree of functional limitation against the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through December 31, 2007. (Tr. at 15, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since August 18, 2006, the amended alleged disability onset date. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of

"degenerative disc disease, decreased vision, and hypertension." (Tr. at 15-17, Finding No. 3). The ALJ also considered Claimant's other potential physical impairments, including diverticulosis, hemorrhoids, diarrhea, history of facial injuries, chronic obstructive pulmonary disease, emphysema, and chest pain; however, the ALJ concluded that these impairments were non-severe. (Tr. at 15-16). In addition, the ALJ considered Claimant's potential mental impairments, including pain disorder, learning disorder, borderline intellectual functioning ("BIF"), and history of alcohol abuse, but determined that these impairments, "considered singly and in combination, do not cause more than minimal limitation in [Claimant's] ability to perform basic mental work activities and are therefore non-severe." (Tr. at 16-17). Under the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination, failed to meet or medically equal any of the listed impairments. (Tr. at 17-18, Finding No. 4). Consequently, the ALJ found that Claimant had the RFC to:

> [P]erform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can only occasionally climb ladders, ropes, scaffolds, ramps, and stairs, balance, stoop, kneel, crouch, and crawl. The claimant has limited depth perception and field of vision due to poor visual acuity in the right eye. He must avoid concentrated exposure to vibration, fumes, odors, dust, gases, and poor ventilation. The claimant must avoid all exposure to hazards, such as moving machinery and unprotected heights.

(Tr. at 18-23, Finding No. 5). Based upon the RFC assessment, the ALJ determined at the fourth step that Claimant was unable to perform any past relevant work. (Tr. at 23, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine if he would be able to engage in substantial gainful activity. (Tr. at 23-25, Finding Nos.

6

7-10). The ALJ considered that (1) Claimant was born in 1961 and was 45 years old, which is defined as a younger individual, on the alleged disability onset date, but subsequently changed age category to closely approaching advanced age; (2) he had a limited education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant is not disabled whether or not Claimant had transferable job skills. (Tr. at 23, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, (Tr. at 23-25, Finding No. 10), including work in light, unskilled occupations, such as laundry bagger, paster, and bench worker. (Tr. at 24). Therefore, the ALJ concluded that Claimant had not been disabled as defined in the Social Security Act from August 18, 2006 through the date of the ALJ's decision, and therefore, was not entitled to benefits. (Tr. at 25, Finding No. 11).

## IV.    <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant raises three challenges to the Commissioner's decision that all relate to his mental limitations. First, Claimant argues that the ALJ failed to account for all of his severe impairments; specifically, Claimant insists that the ALJ erred in finding that Claimant's BIF was a non-severe impairment. (ECF No. 13 at 5-7). Claimant asserts that objective testing supports a diagnosis of BIF and that two psychologists who examined him concluded that he experienced significant limitations as a result of his BIF. (*Id.* at 6-7). Second, Claimant avers that the ALJ failed to assign appropriate weight to the opinions of Tony Goudy, Ph.D., who was one of the psychologists that evaluated Claimant. (*Id.* at 7-8). Specifically, Claimant highlights Dr. Goudy's

opinions that Claimant has marked limitation in memory and concentration, and "poor" ability in the areas of understanding detailed instructions, remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, sustaining an ordinary routine without special supervision, and completing a normal workday or workweek. (*Id.* at 4, 8). Claimant contends that the ALJ improperly discounted Dr. Goudy's opinions because Claimant was evaluated by Dr. Goudy at counsel's request. (*Id.* at 8). Moreover, Claimant maintains that the ALJ failed to explain how he applied the various factors used in assessing medical opinions when weighing Dr. Goudy's opinions. (*Id.*) Finally, Claimant argues that the ALJ erred by neglecting to include mental limitations in his RFC finding. (*Id.* at 9). He insists that the ALJ was required to account for his BIF and limited abilities to read and write in the RFC finding, but neglected to do so. (*Id.*)

In response, the Commissioner contends that her decision should be affirmed for two reasons. First, the Commissioner generally asserts that Claimant failed to meet his burden of proof. (ECF No. 16 at 12-13). More particularly, the Commissioner points out that four state agency medical consultants opined that Claimant had insufficient evidence to prove that he was disabled before his date last insured of December 31, 2007. (*Id.* at 12). Furthermore, the Commissioner argues that the ALJ provided an "adequate and reasonable analysis for the denial" of Claimant's allegations. (*Id.* at 13). Second, the Commissioner maintains that Claimant's claim of disability based on his diagnosis of BIF is not credible. (*Id.* at 13). She avers that Claimant's history of skilled work and admission that he is fast learner belies his allegations of severe mental impairment. (*Id.*) Moreover, the Commissioner argues that the ALJ adequately explained his reasons for finding that Claimant was not

disabled as a result of mental limitations, including Claimant's lack of history of mental health treatment and his substantial activities of daily living. (*Id.* at 15). Additionally, the Commissioner stresses that Claimant's intelligence test scores are inconsistent with his history of performing skilled work. (*Id.*) Finally, the Commissioner maintains that the medical opinions of state agency physicians support the ALJ's decision that Claimant's mental impairments were not severe. (*Id.*)

## V.   Relevant Medical Evidence

The undersigned has reviewed the transcript of proceedings in its entirety including the medical records in evidence. Because the only issues raised by Claimant concern his mental limitations and there are no records for mental health *treatment* in the transcript, the following summary solely discusses psychological evaluations and opinions related to Claimant's mental limitations.[2]

### A. Rakesh Wahi, M.D.

On March 29, 2011, Claimant underwent a consultative examination with Rakesh Wahi, M.D., for the West Virginia Disability Determination Service. (Tr. at 331). Claimant stated that he was unable to read and write, but when asked about his ability to learn, Claimant stated that he was a "fast learner" and learns "real quick." (*Id.*) He also informed Dr. Wahi that he was able to learn very quickly when he started working as an electrician. (*Id.*) Claimant indicated that he believed his inability to read and write was related to his lack of education. (*Id.*) Dr. Wahi noted that Claimant completed the eighth grade. (Tr. at 332). Claimant reported drinking two quarts of beer each day and stated that he was not taking medications at the time

---

[2] As the ALJ noted, there is "minimal evidence prior to 2010" in the record, and Claimant was only insured for DIB through December 31, 2007. (Tr. at 19). With regard to Claimant's mental limitations, there is no evidence in the record predating April 2011. Nonetheless, some of Claimant's mental limitations, including his BIF, presumably relate back to his date last insured.

of the examination. (Tr. at 332-33). Dr. Wahi observed that Claimant was poorly-groomed, but his personal hygiene was fair.[3] (Tr. at 333).

### B. Lester Sargent, M.A.

On April 3, 2011, Claimant was evaluated by Lester Sargent, M.A., Licensed Psychologist, for the West Virginia Disability Determination Service. (Tr. at 339-45). Claimant reported that he drove approximately twenty miles to the interview. (Tr. at 339). He stated that he was separated from his wife and had four children. (Tr. at 340). Claimant asserted that he was applying for benefits because of back pain related to pinched nerves and underdeveloped vertebrae, facial injuries after a car accident, headaches, and an inability to read. (*Id.*) He also reported that depression prevented him from working as well. (*Id.*) Mr. Sargent recorded that the primary focus of clinical attention during the evaluation was Claimant's chronic pain. (*Id.*) Mr. Sargent noted that Claimant experienced mild sadness, worry, anxiety, unsatisfying sleep, and frustration with his inability to work and perform other activities at pre-injury levels. (*Id.*) With regard to education, Claimant described himself as illiterate and stated that he completed the eighth grade after twice repeating it. (*Id.*) Claimant repeated the first and second grades as well, but was not enrolled in special education classes. (Tr. at 341). He noted that his school grades were below average. (*Id.*) Claimant reported no history of mental health treatment or medications. (Tr. at 340). In relation to alcohol abuse, Claimant admitted that he first drank alcohol around age eight and that he still occasionally consumed alcohol. (Tr. at 341). As for employment history, Claimant indicated that he was last employed as an electrician's helper in

---

[3] Most of the observations and opinions by Dr. Wahi relate to Claimant's physical limitations, which are not at issue here.

2003 and that his longest period of employment was about ten years. (*Id.*) Claimant also reported experience as a mechanic and mechanic's helper. (*Id.*) He further informed Mr. Sargent that his driver's license was suspended. (*Id.*)

At the examination, Mr. Sargent administered a series of psychological tests. First, Mr. Sargent had Claimant complete the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"). (Tr. at 341-43). Claimant scored 81 on verbal comprehension, 84 on perceptual reasoning, 86 on working memory, and 76 on processing speed. (Tr. at 342). Claimant earned a full scale IQ score of 78, which placed him within the seventh percentile of individuals his age and within the borderline range of intellectual functioning. (Tr. at 341-42). Mr. Sargent opined that Claimant's IQ score was valid as Claimant had no auditory or motor problems throughout the test, his visual impairment did not affect his performance, he was able to sit throughout the evaluation, he maintained motivation, he did not demonstrate significant frustration, he attempted every task presented, and he maintained relative persistence during testing. (Tr. at 342-43). Mr. Sargent noted that Claimant worked at a mildly slow pace throughout the test and that he occasionally required repetition of directions. (Tr. at 342). Based on Claimant's IQ score, Mr. Sargent opined that Claimant "may experience difficulty in keeping up with his peers in a wide variety of situations that require thinking and reasoning abilities." (Tr. at 341). He further concluded that Claimant's verbal and nonverbal reasoning abilities were in the low average range. (*Id.*)

Next, Mr. Sargent administered the Wide Range Achievement Test, Fourth Edition ("WRAT-IV"). (Tr. at 343). Claimant received grade scores of 1.4 in word reading, 1.1 in spelling, and 4.0 in math computation. (*Id.*) Mr. Sargent opined that

Claimant's scores were valid for the same reasons that Claimant's IQ test score was valid. (*Id.*)

Upon mental status examination, Mr. Sargent noted that Claimant was casually dressed with proper hygiene. (*Id.*) Claimant was cooperative with good eye contact. (*Id.*) His speech was coherent and loquacious, and he was oriented to time, place, person, and date. (*Id.*) Claimant's mood was mildly anxious, and his affect was broad. (*Id.*) Mr. Sargent observed that Claimant's thought processes were understandable and connected. (*Id.*) Claimant's thought content was negative for delusions, paranoia, obsessive thoughts, or compulsive behaviors, and he denied suicidal and homicidal ideation. (*Id.*) Mr. Sargent opined that Claimant's judgment was mildly deficient and his insight was fair. (*Id.*) Claimant's immediate and remote memory was observed to be normal; however, Mr. Sargent determined that Claimant's recent memory was moderately deficient based on his ability to recall only two of four words after a five-minute delay. (*Id.*) Mr. Sargent further opined that Claimant's concentration and persistence were normal, but his pace was mildly slow. (*Id.*)

With regard to social functioning, Mr. Sargent observed that Claimant's social functioning was normal during the evaluation and that Claimant reported going to the store, running errands, taking short walks, taking care of his dogs, attending medical appointments, receiving food stamps, and relying on his mother for financial assistance. (Tr. at 343-44). Claimant reported that he did not visit with friends or family, he did not talk on the telephone, he did not have any close friends, and he did not maintain a checking account. (Tr. at 344).

In relation to daily activities, Claimant stated that he woke up around 6:00

a.m., fed his dogs, and got his son off to school. (*Id.*) Claimant relayed that he performed household chores during the day, if possible, including doing laundry, cleaning dishes, and sweeping. (*Id.*) If not performing chores, Claimant walked to a nearby area to "hang out" until around 3:00 p.m. (*Id.*) Claimant then picked up his son from school and returned home where he ate dinner, helped with the dishes, and got his son ready for bed. (*Id.*) Claimant reported that he took a shower most days, and he was capable of performing all basic self-care duties without assistance. (*Id.*) He also indicated that he was able to cook and watch television. (Tr. at 344-45). Claimant further stated that he talked with his mother. (Tr. at 345).

Mr. Sargent diagnosed Claimant with pain disorder associated with both psychological factors and a general medical condition; learning disorder, not otherwise specified (reading); and BIF. (Tr. at 344). He explained that he assessed a learning disorder based on Claimant's problems with reading that significantly interfere with academic achievement. (*Id.*) Mr. Sargent observed that Claimant's reading grade level score was not substantially below that to be expected of a person with Claimant's IQ score. (*Id.*) With regard to the assessment of BIF, Mr. Sargent determined that Claimant's full-scale IQ score supported that diagnosis. (*Id.*) Mr. Sargent opined that Claimant's prognosis was poor. (Tr. at 345). He concluded that Claimant appeared capable of managing funds if he were awarded benefits. (*Id.*)

### C. Bob Marinelli, Ed.D., and Jeff Harlow, Ph.D.

On April 15, 2011, Bob Marinelli, Ed.D., completed a psychiatric review technique for Claimant's date last insured, December 31, 2007. (Tr. at 348). Dr. Marinelli noted that Claimant alleged that he suffered from "learning problems." (Tr. at 360). However, Dr. Marinelli determined that there was insufficient evidence to

assess Claimant's alleged mental impairment at the time of Claimant's date last insured. (Tr. at 348, 360).

On April 29, 2011, Dr. Marinelli completed another psychiatric review technique. (Tr. at 383). Dr. Marinelli noted that Claimant alleged that he experienced learning problems and depression. (Tr. at 395). He found that Claimant suffered from organic mental disorders, including BIF and learning disability, but that these disorders were non-severe. (Tr. at 383-84). Dr. Marinelli also determined that Claimant suffered from a somatoform disorder, specifically pain disorder, but that this impairment was also non-severe. (Tr. at 383, 389). He opined that Claimant had mild limitation in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (Tr. at 393). Dr. Marinelli also observed that Claimant had no episodes of decompensation of extended duration. (*Id.*) In the consultative notes section of the Psychiatric Review Technique form, Dr. Marinelli summarized the results of Claimant's April 2011 consultative examination with Mr. Sargent. (Tr. at 395). Dr. Marinelli specifically noted Claimant's psychological testing scores, the results of Claimant's mental status examination, Claimant's diagnoses, and Claimant's activities of daily living as reported to Mr. Sargent. (*Id.*) Dr. Marinelli also summarized the activities of daily living contained in Claimant's February 2011 Adult Function Report. (*Id.*) In that report, Claimant asserted that he sometimes made dinner for his sons, took care of his pets with help from his sons, cleaned his house, did laundry, shopped for short periods of time, cared for his personal needs, and handled changes in routine "pretty good." (*Id.*) Claimant also stated that he could not read recipes due to his poor vision, he did not drive, he sometimes did not get along with his son and other people, he stayed to

himself, and he felt depressed. (*Id.*) Dr. Marinelli observed that Claimant further reported that he could only pay attention for five minutes, he could not follow written instructions, he could only follow spoken instructions "about half," and he did not handle stress well. (*Id.*) Dr. Marinelli opined that Claimant's allegations were generally consistent with the record medical evidence with the exception of Claimant's alleged limitations in concentration. (*Id.*) Ultimately, Dr. Marinelli found that Claimant was partially credible. (*Id.*)

On June 13, 2011, Jeff Harlow, Ph.D., prepared a case analysis. (Tr. at 402). After reviewing the evidence in Claimant's file, Dr. Harlow affirmed both psychiatric review techniques completed by Dr. Marinelli. (*Id.*)

### D. Tony R. Goudy, Ph.D.

On February 29, 2012, Claimant attended a psychological evaluation with Tony Goudy, Ph.D., Licensed Psychologist. (Tr. at 466). Dr. Goudy noted that Claimant was referred to him by counsel and that the purpose of the evaluation was "to determine if psychological factors could be adversely affecting [Claimant's] ability to pursue substantial gainful activity." (*Id.*) Claimant informed Dr. Goudy that he experienced learning problems throughout his life and that he was unable to read and write. (*Id.*) Claimant also indicated that he had "always had problems with memory and concentration." (*Id.*) Dr. Goudy recorded that he had reviewed Mr. Sargent's April 2011 evaluation of Claimant. (*Id.*) He noted that Claimant had never received mental health treatment and never been prescribed medication for any psychological condition. (Tr. at 467). Dr. Goudy also indicated that Claimant was separated from his wife, had four children, and resided with one of his sons. (*Id.*) With regard to educational history, Claimant stated that he was held back multiple times in different

grades and dropped out of school in the eighth grade. (*Id.*) Claimant did not recall receiving special education services. (*Id.*) He never obtained his GED. (*Id.*) In relation to work history, Claimant relayed that he last worked as a greaser for garbage trucks approximately eight years prior to the evaluation. (*Id.*) He stated that he worked as an electrician's helper between 1988 and 1999.[4] (*Id.*) On the subject of alcohol consumption, Claimant reported that he drank beer on a daily basis and had a history of excessive drinking. (Tr. at 468).

Upon mental status examination, Dr. Goudy observed that Claimant's attitude was reserved, but cooperative. (*Id.*) He also indicated that Claimant's mood was normal and his affect was mildly restricted. (*Id.*) Dr. Goudy recorded that Claimant's speech and communication were spontaneous and coherent, although he had to reword several questions throughout the evaluation in order for Claimant to understand them. (*Id.*) Dr. Goudy further noted that Claimant denied any history of suicidal ideation or perceptual disturbances. (*Id.*) Claimant was observed to be oriented to time, place, person, and circumstance. (*Id.*) Dr. Goudy opined that Claimant's immediate memory was intact; however, Claimant's recent memory was markedly impaired based on his inability to recall any of four words after a twenty-minute delay. (Tr. at 468-69). Dr. Goudy also recorded that Claimant's remote memory was markedly impaired based on Claimant being "a very poor historian." (Tr. at 469). As to concentration, Dr. Goudy indicated that Claimant made multiple errors in reciting serial threes, which led him to believe that Claimant's concentration was markedly impaired. (*Id.*) With regard to intellectual functioning, Dr. Goudy opined

---

[4] Claimant's Work History Report states that he worked in that position from 1993 to 2002. (Tr. at 180-81).

that Claimant functions in the borderline range based on his evaluation of Claimant, Claimant's academic history, and prior psychological testing. (*Id.*) Dr. Goudy further determined that Claimant's judgment was moderately to markedly impaired given Claimant's responses to various hypothetical scenarios. (*Id.*) As to Claimant's insight, Dr. Goudy observed that Claimant was unable to provide any insight regarding his condition. (*Id.*)

At the evaluation, Dr. Goudy administered the Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS") test. (*Id.*) The test is designed to measure attention, language, visuospatial/instructional abilities, immediate memory, and delayed memory. (*Id.*) Claimant scored within the one-half percentile in immediate memory, third percentile in visuospatial/constructional, fourteenth percentile in language, fifth percentile in attention, and fifth percentile in delayed memory. (*Id.*) Claimant's total scaled score was 66, which placed him in the first percentile. (*Id.*) Dr. Goudy found that these results indicated Claimant was markedly impaired in immediate memory and moderately impaired in all other areas measured. (*Id.*)

Dr. Goudy diagnosed Claimant with history of alcohol abuse, per Claimant's report; rule out cognitive disorder, not otherwise specified; and BIF.[5] (*Id.*) Dr. Goudy opined that Claimant's mental condition merited consideration under Listing 12.02 for organic mental disorders. (Tr. at 470). He determined that Claimant experienced

---

[5] With regard to Dr. Goudy's observation that cognitive disorder should be ruled out, the ALJ correctly determined in his written decision that this was not a definitive diagnosis, but only a possible diagnosis. (Tr. at 16); *see Santiago v. Colvin*, No. 12 Civ. 7052, 2014 WL 718424, at *13 (S.D.N.Y. Feb. 25, 2014) ("In medicine, the phrase 'rule out' indicates a need to eliminate or exclude a diagnosis from consideration, but it does not constitute a diagnosis itself."); *Elmore v. Astrue*, No. 2:11-cv-394-DBH, 2012 WL 2913702, at *3 (D. Me. June 27, 2012) (recognizing that rule out cognitive disorder was not diagnosis of such a disorder); *Merancy v. Astrue*, No. 3:10cv1982, 2012 WL 3727262, at *7 (D. Conn. May 3, 2012) (collecting cases and stating "[i]n medicine, the phrase 'rule out' means to eliminate or exclude something from consideration. It does not constitute a diagnosis.").

mild to moderate impairment in activities of daily living, mild impairment in social functioning, and marked impairment in maintaining concentration, persistence, and pace. (*Id.*) Given these limitations, Dr. Goudy concluded that Claimant did not meet a listing based solely on psychological factors; still, Dr. Goudy found that Claimant's RFC would be affected by his mental impairment. (*Id.*)

As such, Dr. Goudy completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) form. (Tr. at 471). The rating scale on the form ranged from "excellent" to "poor" with "good" and "fair" in between. (*Id.*) "Excellent" was defined as "no limitations or restrictions in functioning"; "good" was defined as "mild restrictions in functioning, able to perform satisfactorily most (over 90%) of the time"; "fair" meant "moderate limitations in function (unable to perform satisfactorily up to ¼ of the workday)"; and "poor" meant "marked limitations in function (unable to perform satisfactorily over ½ of the workday)." (*Id.*) Dr. Goudy found that Claimant possessed "good" ability to interact appropriately with the public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers and peers, maintain socially appropriate behavior, be aware of normal hazards and take appropriate precautions, and travel in unfamiliar places or use public transportation. (Tr. at 472). Dr. Goudy also opined that Claimant retained "fair" ability to remember locations and work-like procedures; understand and remember short, simple instructions; carry out short, simple instructions; perform activities within a schedule; maintain regular attendance; be punctual; work with or near others without being distracted by them; make simple work-related decisions; perform at a consistence pace; adhere to basic standards of neatness and cleanliness; respond

appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (Tr. at 471-72). However, Dr. Goudy found that Claimant retained "poor" ability in the areas of understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, sustaining an ordinary routine without special supervision, and completing a normal workday or workweek. (Tr. at 471). In the sections of the form asking what medical or clinical findings support the functional assessment, Dr. Goudy wrote "see report" or "borderline IQ and memory and concentration problems." (Tr. at 472). Finally, Dr. Goudy recorded that Claimant's other capabilities were not affected by his mental impairment and that Claimant could not manage benefits in his own interest.[6] (Tr. at 473).

## VI. __Standard of Review__

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, its duty is limited in scope; it must adhere to its "traditional function" and

---

[6] On April 18, 2012, Dr. Goudy wrote a letter to Claimant's counsel stating that he did not consider Claimant's history of alcohol abuse in forming his opinions as to Claimant's limitations. (Tr. at 474).

"scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence," *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589), bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

## VII.   Discussion

### A. Step 2 of the Disability Determination Process

Claimant contends that the ALJ erred at step 2 of the process when he incorrectly determined that Claimant's BIF was a non-severe impairment. (ECF No. 13 at 6-7). Claimant insists that his BIF significantly affects his capacity to engage in work-related activities, and, thus, is a severe impairment as defined by the regulations. (*Id.*) In support of his argument, Claimant points to the evaluations performed by Mr. Sargent and Dr. Goudy. (*Id.* at 6-7). Claimant also alleges that the record is replete with evidence substantiating his claim that BIF severely impedes his

ability to read, calculate, spell, and reason, all of which are generally required to compete in the employment arena. (*Id.* at 6).

At the second step of the sequential evaluation process, the ALJ determines whether the claimant has an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. §§ 404.1521(a), 416.921(a); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181, at *1. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28, 1985 WL 56856). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, remembering simple instructions, understanding simple instructions, carrying out simple instructions, using judgment, interacting appropriately with co-workers, and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b). The claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003). The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment. Moreover, to qualify as a severe impairment under step two, the impairment must have lasted, or be expected to last, for a continuous period of at least twelve months, 20 C.F.R. § 416.909, and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of not disabled is made at step two, and the sequential process comes to an end. On the other hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir.1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)); *see also Felton–Miller v. Astrue,* 459 F. App'x 226, 230 (4th Cir. 2011) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement.").

Here, the ALJ found that Claimant had the severe impairments of "degenerative disc disease, decreased vision, and hypertension." (Tr. at 15). Accordingly, the sequential process proceeded to step three. From that perspective, even if the ALJ erred by not considering Claimant's BIF to be severe, Claimant suffered no harm because the outcome at step two was the same: Claimant's applications for benefits moved on to the next step in the sequence. Courts in this circuit have held that failing to list a severe impairment at the second step of the process generally is not reversible error as long as the process continues and any functional effects of the impairment are appropriately considered during the later steps. *See McKay v. Colvin,* No. 3:12–cv-1601, 2013 WL 3282928, at *9 (S.D.W.Va. Jun. 27, 2013); *Cowan v. Astrue,* No. 1:11-cv-7, 2012, WL 1032683, at *3 (W.D.N.C. Mar. 27, 2012) (collecting cases); *Conard v. Comm'r*, No. SAG-12-2290, 2013 WL 1664370, at *2 (D. Md. Apr. 16, 2013) (finding harmless error where Claimant made threshold of severe impairment regarding other disorders and "the ALJ continued with the sequential evaluation process and considered all of the impairments, both

22

severe and non-severe, that significantly impacted [his] ability to work"); *Lewis v. Astrue*, 937 F. Supp. 2d 809, 819 (S.D.W.Va. 2013) (applying harmless error standard where ALJ proceeded to step three and considered non-severe impairments in formulating claimant's RFC); *Cook ex rel. A.C. v. Colvin*, No. 2:11-cv-362, 2013 WL 1288156, at *4 (E.D. Va. Mar. 1, 2013) ("The failure of an ALJ to find an impairment to be severe at Step 2, however, is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process."); *Mauzy v. Astrue,* No. 2:08–cv–75, 2010 WL 1369107, at *6 (N.D.W. Va. Mar. 30, 2010) ("This Court finds that it was not reversible error for the ALJ not to designate any of the plaintiff's other mental conditions as severe or not severe in light of the fact that he did, during later steps of the sequential evaluation process, consider the combined effect of all of the plaintiff's impairments."). A number of federal courts of appeals have agreed with this approach. *Jerome v. Colvin*, 542 F. App'x 566, 566 (9th Cir. 2013); *Gray v. Comm'r of Soc. Sec.*, 550 F. App'x 850, 853-54 (11th Cir. 2013); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013); *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012); *Schettino v. Comm'r of Soc. Sec.*, 295 F. App'x 543, 545 n.4 (3d Cir. 2008); *Hill v. Astrue*, 289 F. App'x 289, 292 (10th Cir. 2008); *Maziarz v. Sec. of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Along with the absence of prejudice to Claimant flowing from the ALJ's step two findings, Claimant's challenge is unpersuasive for other reasons. To begin with, substantial evidence supports the ALJ's conclusion that Claimant's BIF was actually non-severe. At step two, the ALJ determined that Claimant's mental impairments of pain disorder, learning disorder, BIF, and history of alcohol abuse, considered singly

and in combination, did not cause more than minimal limitation in Claimant's ability to perform basic mental work activities. (Tr. at 17). In reaching this conclusion, the ALJ correctly considered the paragraph B criteria in section 12.00(C) of the Listings. (*Id.*) The ALJ first addressed any functional limitations in Claimant's activities of daily living. (*Id.*) He noted that Claimant was able to make meals for himself and his son, clean his house, visit friends' homes, take care of his pets, and independently care for his own personal needs. (*Id.*) As such, the ALJ concluded that Claimant had only mild limitations in his activities of daily living. (*Id.*) Next, the ALJ considered Claimant's capacity to maintain relationships and function socially. (*Id.*) The ALJ review Claimant's self-reported activities in this regard, including shopping for short periods of time and "hanging out" with friends on a daily basis. Claimant further indicated that he had no difficulty getting along with family, friends, or neighbors. (*Id.*) Accordingly, the ALJ determined that Claimant had only a mild limitation in this area. (*Id.*) The ALJ then discussed Claimant's limitations in the area of concentration, persistence, or pace. (*Id.*) The ALJ acknowledged that, according to Claimant's own statements, Claimant could finish what he started, handle changes in routine "pretty" well, and did not have problems following spoken instructions. (*Id.*) Consequently, the ALJ found that Claimant possessed only mild limitations in the area of concentration, persistence, or pace. (*Id.*) Finally, as for episodes of decompensation of extended duration, the ALJ confirmed that Claimant had not experienced any such episodes. (*Id.*) Because Claimant's mental impairments caused no more than mild limitations in the first three functional areas, and Claimant had no episodes of decompensation, the ALJ ascertained that Claimant's mental impairments were non-severe. (*Id.*) (citing 20 C.F.R §§ 404.1520a(d)(1),

416.920a(d)(1)). Throughout his analysis, the ALJ clearly cited to specific facts found in the record that informed his rulings regarding the severity of Claimant's mental impairments. (Tr. at 17). Having reviewed the record, the Court finds substantial evidence, including Claimant's own descriptions of his activities and capabilities, supporting the ALJ's determination that Claimant's mental impairments are non-severe.

In addition, the ALJ's step two decision was reinforced by his additional discussion of Claimant's mental impairments at later steps of the sequential process. In assessing Claimant's RFC, the ALJ started by discussing Claimant's testimony at the administrative hearing. He noted that Claimant allegedly had problems focusing in school and only completed the eighth grade. (Tr. at 18). Claimant also indicated that he had difficulty reading and writing, and that his cousin read his mail to him. (*Id.*) Claimant stated that he lived with his 17-year-old autistic son, who helped with cutting the grass, cleaning up the house, and shopping. (Tr. at 19). After discussing Claimant's testimony and allegations, the ALJ found that Claimant's allegations of intellectual impairment were not entirely credible given the objective medical evidence and his self-described activities of daily living. (Tr. at 19, 21). The ALJ emphasized certain conflicts in the record, such as Claimant's testimony at the administrative hearing that he did not perform grocery shopping or household chores when, in contrast, he previously told Mr. Sargent that he went shopping, ran errands, and performed household chores, such as cooking, doing laundry, cleaning dishes, and sweeping. (*Id.*) The ALJ also highlighted that Claimant's daily routine included caring for his dogs, getting his son off to school, hanging out with friends in the afternoon, and later picking up his son. (*Id.*) As the ALJ pointed out, these

discrepancies tended to undermine the reliability of Claimant's allegations as to the severity of his intellectual limitations.

Moreover, the ALJ discussed the psychological evaluations performed by Mr. Sargent and Dr. Goudy when determining Claimant's RFC. (Tr. at 19-22). With regard to Mr. Sargent's evaluation of Claimant, the ALJ acknowledged Claimant's low scores on the WAIS-IV and the WRAT-IV, but found that these scores were inconsistent with Claimant's history of performing skilled work as an electrician.[7] (Tr. at 21). The ALJ stressed Mr. Sargent's opinion that Claimant's concentration and persistence were normal and that his pace was only mildly slow. (*Id.*) The ALJ also noted Mr. Sargent's observation that Claimant had normal social functioning. (*Id.*) The ALJ pointed out that Claimant reported to Dr. Wahi that he was a very quick learner, particularly when it came to learning his past job as an electrician. (*Id.*) Claimant had no history of mental health treatment and no evidence of deficits in intellectual functioning impacting his prior work. (*Id.*) In relation to Mr. Sargent's opinion that Claimant's prognosis was poor, the ALJ assigned no weight to this opinion because the objective findings in Mr. Sargent's report did not support such a negative prognosis. (Tr. at 22).

Next, the ALJ summarized Dr. Goudy's evaluation of Claimant. (Tr. at 21). In discussing Dr. Goudy's opinions as to Claimant's intellectual deficits, the ALJ again cited Claimant's history of skilled work and observed that the jobs identified by the vocational expert at the administrative hearing were all unskilled occupations. (*Id.*) The ALJ once again commented that the evidence showed that Claimant had only minimal limitations due to an intellectual deficit. (*Id.*) The ALJ remarked that Dr.

---

[7] As noted above, Claimant reported being both an electrician and an electrician's helper.

Goudy had diagnosed Claimant with BIF "essentially based on reported information by the claimant and the testing obtained by Mr. Sargent." (*Id.*) With regard to Dr. Goudy's opinions contained in the assessment form, the ALJ assigned those opinions no weight. (Tr. at 22). The ALJ observed that Dr. Goudy's opinions were based on a "one-time evaluation" of Claimant after referral by counsel. (*Id.*) The ALJ also rejected Dr. Goudy's opinions because Claimant had no history of mental health treatment for his alleged mental conditions. (*Id.*) Although the ALJ acknowledged that Dr. Goudy's opinions were based, in part, on psychological testing, he found that Claimant's activities of daily living and history of skilled employment called into question the accuracy of the test results. (*Id.*) In weighing Dr. Goudy's opinions, the ALJ reiterated the objective evidence supporting a finding that Claimant's mental impairments were non-severe. (*Id.*)

The ALJ then reviewed in his RFC discussion the opinions of Dr. Marinelli and Dr. Harlow, which confirmed his finding of non-severity. The ALJ summarized both psychiatric review techniques prepared by Dr. Marinelli and the case analysis completed by Dr. Harlow, both of which contained opinions that Claimant's mental impairments, including BIF, were non-severe. (*Id.*) The ALJ assigned some weight to these opinions to the extent that they were consistent with a inding that Claimant's mental impairments were non-severe. (*Id.*) In support of assigning some weight to Dr. Marinelli's and Dr. Harlow's opinions, the ALJ asserted that Claimant had no history of treatment for a psychological condition and Claimant was not as intellectually restricted as he alleged. (*Id.*)

The ALJ's thorough analysis of the evidence, including Claimant's activities of daily living, his work history, psychological evaluations, and opinion evidence,

supports his finding that Claimant's BIF was a non-severe impairment. Claimant's diagnosis of BIF alone did not require the ALJ to find that Claimant suffered from a severe mental impairment. *See Gross*, 785 F.2d at 1166 ("[A] psychological disorder is not necessarily disabling. There must be a showing of related functional loss."); *Davis v. Comm'r, Soc. Sec. Admin.*, No. SAG-12-0813, 2013 WL 1124589, at *1 (D. Md. Mar. 18, 2013) ("Under Fourth Circuit law, a mere diagnosis of borderline intellectual functioning does not establish a severe impairment absent some corresponding loss of function."); *Widener v. Astrue*, No. 2:11-cv-00670, 2012 WL 4356673, at *4 n.4 (S.D.W.Va. Sept. 24, 2012) (noting that United States Court of Appeals for the Eighth Circuit has "categorically defined [BIF] as a 'severe' impairment" if the diagnosis is supported by sufficient medical evidence, but declining to establish bright-line rule concerning BIF that would contravene SSA's policy of rendering "highly individualized" decisions); *Caldwell v. Astrue*, No. 3:09-cv-00777, 2010 WL 5184247, at *12 (S.D.W.Va. Dec. 15, 2010) (rejecting argument that borderline intelligence is *ipso facto* severe). Indeed, the ALJ supplied a number of persuasive reasons based on the objective evidence establishing that Claimant's BIF was not a severe impairment.

First, as the ALJ emphasized throughout his decision, Claimant's considerable activities of daily living were consistent with only mild intellectual limitations. (Tr. at 17, 21, 22); *see also* 20 C.F.R §§ 404.1520a(d)(1), 416.920a(d)(1) (stating that rating of "none" or "mild" in the first three functional areas and "none" with regard to episodes of decompensation generally means that mental impairment is non-severe). Second, the ALJ pointed out numerous times that Claimant never received any mental health treatment and was never prescribed any medication for any psychological condition, which demonstrates that his mental impairments were not

as severe as alleged. (Tr. at 21-22); *see Estep v. Astrue*, No. 3:11-cv-00487, 2012 WL 3079182, at *10 (S.D.W.Va. July 30, 2012) (finding lack of mental health treatment supported ALJ's finding that mental impairments were non-severe). Third, the ALJ repeatedly noted that Claimant performed past skilled work as an electrician, which required abilities that Claimant asserted he was able to learn very quickly. (Tr. at 21, 22). In a Work History Report, Claimant stated that his past work required him to install electrical wire and panel boxes in hotels. (Tr. at 181). Relatedly, Claimant testified at the administrative hearing that this work required him to read blueprints to determine "how many circuits went in a pipe or which rooms it go [*sic*] to, how far away from the panel [he] could run [wiring] without losing voltage." (Tr. at 47). When asked to further describe his past work, Claimant stated: "I go read the blueprints, write down everything, then I'd go out there and referee the rest of it, you know, pull the wire myself or feed it or load it or whatever." (*Id.*) The vocational expert classified Claimant's past work as "skilled, medium level work ... with exposure to ... electrical shock." (Tr. at 53-54). Additionally, Claimant informed a representative from the SSA that he was a "lead man" at his job and supervised one to eight people on a daily basis. (Tr. at 195). Clearly, this work is incompatible with Claimant's allegation that his BIF significantly limited his ability to perform work-related activities. *See Widener*, 2012 WL 4356673, at *3-*4 (finding that Claimant's past skilled work as a butcher for two decades, which also involved supervisory responsibilities, supported ALJ's conclusion that claimant's BIF was non-severe); *Bryant v. Astrue*, No. 5:10-CV-281-FL, 2011 WL 1750797, at *7, *9 (E.D.N.C. Apr. 15, 2011) (report and recommendation wherein magistrate judge found that claimant's *unskilled* work history supported ALJ's finding that claimant's BIF was non-severe impairment);

*Caldwell*, 2010 WL 5184247, at *12 (recognizing that claimant's past semi-skilled work supported ALJ's finding that Claimant's borderline intelligence was non-severe).

As for the psychological evaluation and opinion evidence related to the severity of Claimant's BIF, the ALJ recognized that Mr. Sargent found Claimant's concentration and persistence were normal while his pace was only mildly slow. (Tr. at 21). The ALJ also noted that Mr. Sargent opined that Claimant had normal social functioning. (*Id.*) In discussing Claimant's scores on psychological tests administered by Mr. Sargent, the ALJ properly explained his reasons for determining that the scores did not accurately reflect Claimant's level of intellectual functioning. (*Id.*) Moreover, Mr. Sargent failed to reconcile Claimant's test scores with his past skilled work history. With regard to Dr. Goudy's opinions, the ALJ implicitly noted that Dr. Goudy was not a treating mental health professional, only an examining psychologist. The ALJ recognized that Dr. Goudy's diagnosis of BIF was based primarily on psychological test scores obtained by Mr. Sargent, which the ALJ determined were not a proper reflection of Claimant's mental abilities, and Claimant's self-reports, which the ALJ found were not entirely credible. In rejecting Dr. Goudy's assertion that Claimant's concentration, persistence, and pace were markedly impaired, the ALJ cited Claimant's skilled work history, lack of mental health treatment, and high-level activities of daily living. Certainly, Claimant's past work as an electrician or electrician helper for a number of years required the ability to concentrate for extended periods of time. As with Mr. Sargent, Dr. Goudy similarly failed to explain how Claimant could have performed his past skilled work if he were as intellectually impaired as Dr. Goudy opined. Furthermore, as the ALJ recognized, Dr. Goudy

30

concluded that Claimant retained "fair" ability in a number of work-related areas. (Tr. at 22). Specifically, Dr. Goudy determined that Claimant possessed at least "fair" ability to perform a number of basic work activities, including remembering simple instructions, understanding simple instructions, carrying out simple instructions, interacting appropriately with co-workers, and dealing with changes in a routine work setting. (Tr. at 471-72); *see also* 20 C.F.R. §§ 404.1521(b), 416.921(b) (providing examples of basic work activities). As for Dr. Goudy's other opinions finding that Claimant had a "poor" ability in a number of work areas, the ALJ correctly determined that the objective evidence did not support those beliefs. (Tr. at 22). Dr. Goudy failed to provide much of an explanation for the severity of the mental limitations that he found, (Tr. at 471-72), and the Court is hard-pressed to believe (as was the ALJ) that Claimant's BIF prevents him from completing a normal workday or workweek and sustaining an ordinary work routine without special supervision when he performed his past skilled work for a number of years and, by his own admission, *even supervised others* in performing what could certainly be considered dangerous work. Finally, as discussed above, the opinions of Dr. Marinelli and Dr. Harlow support the ALJ's finding that Claimant's mental impairments were non-severe. In sum, substantial evidence supports the ALJ's finding that Claimant's BIF was not a severe impairment as it did not cause more than minimal limitation in Claimant's ability to perform basic mental work activities.

A second reason Claimant's challenge fails is that the ALJ considered all of Claimant's impairments when assessing his RFC, including limitations related to his mental impairments. (Tr. at 20-22). Indeed, the ALJ expressly analyzed the evidence pertaining to Claimant's BIF during the written analysis of Claimant's RFC finding.

(*Id.*) However, for all of the reasons stated above, the ALJ declined to include limitations in Claimant's RFC related to his mental impairments. As discussed later in this opinion, the ALJ's decision in that regard is supported by substantial evidence. Because the ALJ appropriately considered the functional effects of Claimant's mental impairments throughout the sequential process, any error by the ALJ in declining to find that these conditions were severe impairments was harmless. *See, e.g., McKay*, 2013 WL 3282928, at *9.

Finally, Claimant's challenge must also be rejected because its premise is fundamentally flawed. Claimant presumes that if the ALJ found Claimant's mental impairments to be severe impairments at step two of the process, he automatically was bound to include functional limitations in the RFC finding to account for those impairments. "To the extent [Claimant] suggests that a finding of severe impairment at Step 2 necessarily requires limitations on a claimant's ability to perform basic work activities, this argument has no merit." *Burkstrand v. Astrue,* 346 F. App'x 177, 180 (9th Cir. 2009); *see also Perez v. Colvin*, No. 3:13CV868, 2014 WL 4852836, at *19 (D. Conn. Apr. 17, 2014) (report and recommendation noting that "ALJ is not required to assess additional limitations for each impairment"), report and recommendation adopted by 2014 WL 4852848 (D. Conn. Sept. 29, 2014); *Walker v. Colvin,* No. C13–3021–MWB, 2014 WL 1348016, at *7 (N.D. Iowa Apr. 3, 2014) ("A finding of a severe impairment at Step Two does not require the ALJ to provide related functional limitations at Step Four."); *Burns v. Astrue*, No. 2:11-cv-151-GZS, 2012 WL 313705, at *4 (D. Me. Jan. 30, 2012) (report and recommendation recognizing that "a finding of a severe impairment need not always result in limitations in an RFC"); *Hughes v. Astrue,* No. 1:09CV459, 2011 WL 4459097, at *10

(W.D.N.C. Sept. 26, 2011) (holding that a finding of impairment at step two is not "proof that the same limitations have the greater significant and specific nature required to gain their inclusion in an RFC assessment at step four"). As was demonstrated by the ALJ's assessment, whatever symptoms Claimant displayed with regard to his BIF, the record did not support a determination that they caused more than a minimal impact on Claimant's ability to do work-related activities.

Therefore, the Court **FINDS** that the ALJ did not err at step two of the sequential process when he declined to find that Claimant's BIF was a severe impairment.

### B. The ALJ's Consideration of Dr. Goudy's Opinions

Claimant also contends that the ALJ failed to assign appropriate weight to the opinions of Dr. Goudy. (ECF No. 13 at 7). Claimant insists that the ALJ improperly discounted Dr. Goudy's opinions because Claimant was evaluated by Dr. Goudy at counsel's request. (*Id.* at 8). Moreover, Claimant maintains that the ALJ failed to explain how he applied the various factors used in assessing medical opinions when weighing Dr. Goudy's opinions. (*Id.*) Claimant asserts that Dr. Goudy's opinions were consistent with psychological testing performed by both Dr. Goudy and Mr. Sargent. (*Id.*)

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what

33

[he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). For purposes of the regulations, a consultative examiner who examines a claimant once is not considered a treating source. *See id.* (recognizing that individual examinations, such as consultative examinations, are not entitled to more weight under treatment relationship factor of regulations); *see also Rose v. Comm'r of Soc. Sec.*, 175 F.3d 1015, 1999 WL 147618, at *2 (4th Cir. Mar. 18, 1999) (unpublished table decision) (stating ALJ was not required to accord consultative examiner's report same weight accorded to report prepared by treating physician); *Martindale v. Astrue*, No. 1:09cv466, 2011 WL 1103770, at *4 (W.D.N.C. Feb. 24, 2011) (report and recommendation wherein magistrate judge noted that physician who examined claimant as result of counsel's referral was not a treating source). In weighing the medical opinions of non-treating examining sources, the ALJ considers certain factors listed in 20 C.F.R. § 404.1527(c)(3)-(6) and 20 C.F.R. § 416.927(c)(3)-(6), including supportability, consistency, specialization, and any other specific factor bearing on the weight of the opinion brought to the ALJ's attention.

Medical source statements on issues reserved to the Commissioner, however, are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

As Claimant points out, the ALJ did not explicitly supply details in his written decision regarding how he applied the factors in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) to determine the weight given to Dr. Goudy's opinions. Instead, the ALJ summarized all of the evidence, including Dr. Goudy's evaluation of Claimant, and listed a number of reasons why Dr. Goudy's opinions were entitled to no weight, without specifically citing to any of the factors contained in the regulations. (Tr. at 21-22). Claimant has not cited any authority requiring an ALJ to specifically discuss the factors contained in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) when weighing a **_non-treating_** medical source's opinions. To the contrary, this Court has held that an ALJ need not explicitly discuss the factors for weighing opinion evidence even when the opinion is derived from a **_treating source_** and the ALJ declines to afford the opinion controlling weight. _Hardy v. Colvin_, No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014); _Young v. Colvin_, No. 3:13-cv-20719, 2014 WL 4546958, at *13 (S.D.W.Va. Sept. 12, 2014); _Tucker v. Astrue_, 897 F. Supp. 2d 448, 468 (S.D.W.Va. 2012); _see also Jividen v. Colvin_, No. 3:12-04698, 2014 WL 1333196, at *1, *21 (S.D.W.Va. Mar. 31, 2014) (adopting PF&R wherein magistrate judge recognized that ALJ need not explicitly mention each factor contained in 20 C.F.R. § 404.1527(c) when evaluating treating physician's opinion). Nevertheless, the ALJ must assign weight to a non-treating source's opinion and adequately explain his reasons for doing so. 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii) (recognizing that ALJ must explain weight given to opinions of non-treating sources); _see also Bryant ex rel. Bryant v. Barnhart_, 63 F. App'x 90, 95 (4th Cir. 2003) (stating that ALJ must explain weight accorded to non-treating source opinions). The ALJ's explanation should be sufficiently clear so

36

that a court may meaningfully review his weighing of the opinion. *Thomas v. Comm'r, Soc. Sec.*, No. WDQ-10-3070, 2012 WL 670522, at *7 (D. Md. Feb. 27, 2012) (citing *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009), and *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 362 (3d Cir. 2011)).

Here, as discussed in detail above, the ALJ provided a number of reasons for rejecting Dr. Goudy's opinions. Contrary to Claimant's position, the ALJ did not discredit Dr. Goudy's opinions solely on the basis that Claimant was referred to Dr. Goudy by counsel. While the ALJ pointed this fact out, it was to confirm that Dr. Goudy was *not* a treating psychologist. The ALJ also provided at least four additional reasons for rejecting Dr. Goudy's opinions: (1) Claimant had no history of mental health treatment and had never reported taking prescriptions for a psychological condition; (2) the objective evidence supported a finding that Claimant's intellectual deficits only caused a minimal limitation in functioning; (3) Claimant's activities of daily living were inconsistent with Dr. Goudy's opinions; and (4) Claimant's history of skilled employment was inconsistent with Dr. Goudy's opinions. (Tr. at 22). All of these reasons are supported by record evidence and constitute good reasons for rejecting Dr. Goudy's opinions.

First, the ALJ appropriately considered Claimant's lack of any mental health treatment in discrediting Dr. Goudy's opinions as to the severity of Claimant's mental limitations. One might reasonably conclude that if Claimant's concentration were as severely impaired as Dr. Goudy opined, Claimant would have sought out mental health treatment to determine the cause and receive any available treatment. Second, the ALJ implicitly noted that other evidence did not support Dr. Goudy's opinions. Examples of evidence contradicting Dr. Goudy's opinions are apparent throughout

37

the record. For instance, Mr. Sargent's finding that Claimant's concentration was normal belied Dr. Goudy's opinion that Claimant's concentration was markedly impaired. Likewise, the opinions of Dr. Marinelli and Dr. Harlow, which were formed after reviewing Mr. Sargent's evaluation report, contravened Dr. Goudy's opinions. There are also conflicts *within* Dr. Goudy's report. At one point in his report, Dr. Goudy opines that Claimant's immediate memory is intact; at another, Dr. Goudy describes Claimant's immediate memory as markedly impaired. (Tr. at 468-69). Admittedly, Dr. Goudy's statements were based on different tests that he administered, *but he never addressed or explained the discrepancy in his report*. Third, the ALJ correctly emphasized that Claimant's activities of daily living were inconsistent with Dr. Goudy's opinions as to his functional limitations. For example, Dr. Goudy opined that Claimant was mildly to moderately impaired in his activities of daily living, yet Mr. Sargent's report, which Dr. Goudy apparently reviewed, (Tr. at 466), notes that Claimant was able to go to the store, run errands, cook, clean his home, care for his own grooming and hygiene, care for his son, and care for his dogs. All of these activities undermine Dr. Goudy's opinion as to Claimant's impairment in activities of daily living. *See* 20 C.F.R. § 404, Subpart P, App. 1, ¶ 12.00(C)(1) (listing examples of activities of daily living). Finally, as the ALJ stressed throughout his written decision, Claimant's past skilled work is inconsistent with Dr. Goudy's opinions as to the severity of Claimant's mental impairments. Although Dr. Goudy noted that Claimant had previously worked as an electrician's helper for a number of years, he failed to reconcile his opinions with Claimant's history of skilled work. While Dr. Goudy asserted that Claimant retained "poor" ability to sustain an ordinary routine without special supervision, maintain attention and concentration for

extended periods, and complete a normal workday or workweek, Claimant's past work as an electrician or electrician's helper would have required all of those abilities in abundance. Claimant's past work required him to read and analyze blueprints, work with materials that are potentially dangerous, and supervise others. Certainly those job responsibilities required a great deal of sustained concentration and attention. Moreover, because Claimant described himself as a "lead man" at that job, it appears that Claimant was entirely capable of handling a work routine without any special supervision. Indeed, Claimant was the one doing the supervising. As for Claimant's ability to complete a normal workday or workweek, there is nothing in the record to suggest that Claimant was ever terminated from a job because he was unable to complete a normal workday or workweek due to his mental impairments. Furthermore, as with all of his other opinions on the assessment form, Dr. Goudy failed to cite any specific medical or clinical findings to support his opinion in this functional area other than stating "see report, borderline IQ and memory and concentration problems."

In sum, the ALJ thoroughly explained his reasons for rejecting Dr. Goudy's opinions as to the severity of Claimant's mental impairments. Those reasons are supported by substantial evidence, which the ALJ specifically cited in his extensive written decision. In addition, the Court can infer from the explanation provided by the ALJ that he used the appropriate factors in weighing Dr. Goudy's opinions. The ALJ recognized that Dr. Goudy was a consultative examiner and that he held a Ph.D. (Tr. at 21). The ALJ also examined the supportability and consistency of Dr. Goudy's opinions as demonstrated by his thorough review of Claimant's activities of daily living, skilled work history, Dr. Goudy's consultative report, and the other opinion

evidence. (*Id.* at 17, 20-22).

Finally, Claimant's other arguments are similarly unconvincing. Contrary to Claimant's contention, the ALJ did not ignore Claimant's allegations of intellectual difficulty, which he purports were consistent with Dr. Goudy's opinions; rather, the ALJ considered them and properly discarded them. With regard to Claimant's argument that the psychological test results are consistent with Dr. Goudy's opinions, the ALJ properly explained his reasons for determining that the scores did not accurately reflect Claimant's level of intellectual functioning; specifically, the ALJ highlighted Claimant's skilled work history and statement to Dr. Wahi that he was a very quick learner.

Therefore, the Court **FINDS** that the ALJ complied with the applicable Social Security regulations and rulings in weighing the medical source opinions, and he supplied a more than sufficient explanation, which is supported by substantial evidence, for rejecting Dr. Goudy's opinions.

### C. The ALJ's RFC Determination

Finally, Claimant asserts that the ALJ should have included mental limitations in formulating Claimant's RFC. (ECF No. 13 at 9). Claimant argues that his BIF has more than a minimal effect on his ability to perform basic work activities, yet, the ALJ failed to include any limitations with regard to his BIF in the RFC finding. (*Id.*) Claimant also insists that his learning disability and first-grade reading level should have been taken into account by the ALJ. (*Id.*) In addition, Claimant contends, as he did in making his step two argument, that the ALJ ignored consistent evidence throughout the record that Claimant's BIF was severe. (*Id.*)

Social Security Ruling 96-8p provides guidance regarding the assessment of a

claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."1996 WL 374184, at *1. RFC is a measurement of the **most** that a claimant can do despite his or her limitations and is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. A proper RFC assessment requires the ALJ to "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (e.g. 8 hours a day, for 5 days a week, or an

equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the record." *Id.* Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.*

The Court has summarized the ALJ's RFC discussion in detail above and need not do so again here. Nonetheless, a few key points from ALJ's RFC discussion merit mention. After extensively reviewing and analyzing the consultative examination reports, the opinion evidence, Claimant's activities of daily living, and his work history, the ALJ concluded that Claimant's mental impairments caused only minimal limitation in functioning. (Tr. at 17, 20-22). Consequently, the ALJ determined that the evidence did not support the inclusion of mental limitations in the RFC finding. The Court has reviewed the specific evidence cited by the ALJ in discussing Claimant's RFC and **FINDS** that the evidence supports his conclusion as to Claimant's lack of mental limitations. For example, Dr. Marinelli and Dr. Harlow opined that Claimant's BIF was non-severe and caused only mild limitations. Similarly, the Claimant's skilled work history as an electrician or electrician's helper supports a finding that mental limitations do not impede his ability to perform work. Likewise, the ALJ's finding is supported by Mr. Sargent's observation that Claimant's concentration and persistence were normal while his pace was only mildly slow.

Not only did the ALJ discuss the evidence that supported his RFC determination, but in accordance with SSR 96-8p, he also explained the inconsistences in the record and resolved them. For example, the ALJ noted that Claimant's psychological test scores indicated that he had some intellectual impairments; however, the ALJ explained that Claimant's test scores were

inconsistent with his history of skilled work and self-proclaimed ability to learn quickly. It is the ALJ's duty to resolve any conflicts in the record, not the Court's. *See Slaughter v. Barnhart*, 124 F. App'x 156, 157 (4th Cir. 2005) (recognizing that the ALJ has the duty to resolve conflicts in any evidence presented, not the courts). While Claimant disagrees with the ALJ's ultimate decision in resolving the conflicting evidence, the Court **FINDS** that the ALJ's conclusions are supported by substantial evidence.

Moreover, the ALJ specifically observed that the jobs he determined that Claimant could perform were categorized as unskilled by the vocational expert. (Tr. at 21, 24); *cf. Rhodes v. Astrue*, No. 3:09-cv-00810, 2010 WL 3360091, at *9-*10 (S.D.W.Va. Aug. 6, 2010) (stating that ALJ's failure to consider claimant's BIF diagnosis was harmless based, in part, on ALJ limiting claimant to unskilled work in RFC finding), proposed findings and recommendation adopted by 2010 WL 3360089 (S.D.W.Va. Aug 25, 2010). The regulations describe unskilled work as:

> [W]ork which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, [the SSA] consider[s] jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs.

20 C.F.R. §§ 404.1568(a), 416.968(a). Surely, given Claimant's past skilled work and ability to learn job skills quickly, he could perform work that requires little or no judgment to perform simple duties.

Finally, with regard to Claimant's low-level reading ability, the ALJ recognized that Claimant had a limited education when assessing Claimant's ability to perform

43

other work. (Tr. at 23). The regulations state that "[l]imited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. [The SSA] generally consider[s] that a 7th grade through the 11th grade level of formal education is a limited education." 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3). The ALJ recognized that Claimant completed the eighth grade, which tends to fall within the definition of limited education. (Tr. at 18). The ALJ also recognized that Claimant told Dr. Wahi that he was a fast learner. (Tr. at 21). While Claimant has maintained that he is illiterate, (Tr. at 188), which is another educational level that the ALJ could have assigned, he has also stated at other times that he can read to varying degrees. (Tr. at 208) (stating he "can't spell or read that good [sic]"); (Tr. at 216) (stating he has difficulty reading, but reads using a magnifying glass). The regulations define illiteracy as "the inability to read or write. [The SSA] consider[s] someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling."[8] 20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1). Claimant failed to present sufficient evidence to support a finding that he cannot read or write a simple message. In fact, there appears to be evidence to the contrary, such as Claimant's slightly above first-grade reading level as determined by Mr. Sargent, his eighth grade education, his ability to

---

[8] Discussing the interplay between unskilled work and illiteracy, the Medical-Vocational Guidelines state: "While illiteracy or the inability to communicate in English may significantly limit an individual's vocational scope, the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance." 20 C.F.R. § 404, Subpart P, App. 2, ¶ 202.00(g).

learn quickly, and his ability to read blueprints and write down his observations as to those blueprints at his past job. (Tr. at 36, 47, 331, 343). Furthermore, neither Mr. Sargent nor Dr. Goudy included illiteracy in their diagnoses, which the ALJ discussed. (Tr. at 16, 344, 469-70).[9]

In sum, the ALJ cited and thoroughly discussed specific evidence in determining Claimant's RFC. The ALJ extensively explained his reasons for not including limitations related to Claimant's mental impairments. The Court **FINDS** that the ALJ's reasons are supported by substantial evidence.

## VIII.  Conclusion

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

---

[9] In any event, the Dictionary of Occupational Titles' (DOT) job-duty descriptions for the jobs that the ALJ determined Claimant could perform do not appear to require reading skills above those that Claimant possesses. *See* DOT 920.687-018, 1991 WL 687965 (laundry bagger); DOT 783.687-026, 1991 WL 680942 (paster); DOT 700.687-010, 1991 WL 678924 (bench worker). The Court recognizes that all of the jobs purportedly require a "language" level of one, which means that the person performing the work must be able to "[r]ecognize [the] meaning of 2,500 (two- or three-syllable) words," "[r]ead at rate of 95-120 words per minute," and "[c]ompare similarities and differences between words and between series of numbers." *Id.* However, after reviewing the responsibilities of each job as described in the DOT, it seems that the reading skills described above are not required to perform each job. *See, e.g., Dickerson v. Colvin*, No. 12-CV-05585, 2014 WL 562981, at *11 (D.N.J. Feb. 11, 2014) (recognizing that unskilled bench assembly work does not require ability to read or write); *Price v. Colvin*, No. 4:12-cv-04119, 2013 WL 6450227, at *2 (W.D. Ark. Dec. 10, 2013) (noting that vocational expert testified garment bagger job did not require reading of written instructions); *Wheeler v. Colvin*, No. CIV-12-0793-F, 2013 WL 2924893, at *2 (W.D. Okla. June 13, 2013) (noting that vocational expert testified illiterate person could perform job of bench assembler); *Henderson v. Astrue*, No. 4:07-CV-093-A, 2008 WL 269450, at *4-*5 (N.D. Tex. Jan. 30, 2008) (noting that vocational expert testified dry cleaning bagger job did not require reading). It appears that the DOT has no level of zero for "language" skills, so level one and the standard definition above is used to rate every job that requires a low-level reading ability no matter the practical reading skill necessary. *Cf. Warf v. Shalala*, 844 F. Supp. 285, 289 (W.D. Va. 1994) (noting that level one is lowest "language" level in DOT and that DOT essentially fails to contemplate some of jobs listed within it can be performed by illiterate persons). Moreover, the DOT states that the job of electrician requires a "language" level of three and the job of electrician helper requires a "language" level of two, both of which Claimant stated he performed in the past for a number of years. DOT 824.261-010, 1991 WL 681733 (electrician); DOT 829.684-022, 1991 WL 681830 (electrician helper).

The Clerk of this Court is directed to transmit copies of this Order to counsel of record.

**ENTERED**: March 3, 2015

Cheryl A. Eifert
United States Magistrate Judge